# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

IN RE:                                                        In Proceedings
                                                             Under Chapter 12
KARL A. BLAKE
JENNA K. BLAKE
                                                             Case No. 16-60425

         Debtor(s).

## OPINION

This case is before the Court for consideration of several matters: Objections to

Confirmation of the Debtors' First Amended Plan filed by creditors Bunker Hill Supply

Company ("Bunker Hill Supply") and First Financial Bank, N.A. ("First Financial"); First

Financial's Motion to Reconsider or Modify Order Authorizing Use of Cash Collateral; and First

Financial's Motion for Relief from Stay.

## FACTS

Karl and Jenna Blake ("Debtors") operate a family farming operation in southeast

Illinois.  At one time, they had farmed as much as 2,200 acres.  However, in 2015 the Debtors

lost the majority of their leased ground, and on November 2, 2016, they filed a voluntary petition

under Chapter 12 of the Bankruptcy Code in order to reorganize their farming operation.  The

Debtors' original schedules listed assets of $1,763,592.29 (Schedule A/B) and liabilities of

$2,692,861.40 (Schedules D and E/F).  Schedule A/B was subsequently amended on December

2, 2016 in order to remove several items of personal property that the Debtors had previously

listed on their original schedule.[1]  This resulted in a reduction in the Debtors' total assets to $1,760,592.29.

On March 15, 2017, the Debtors filed their original Chapter 12 Plan of Reorganization ("Original Plan"), to which numerous creditors, including First Financial and Bunker Hill Supply, objected.  First Financial is a secured creditor by virtue of a lien on the Debtors' crops, machinery, accounts, inventory, and general intangibles.  It has filed a secured claim in the amount of $594,147.48. S*ee* Claim #18-1. Conversely, Bunker Hill Supply is a wholly unsecured creditor.  According to its proof of claim, Bunker Hill Supply is owed $352,456.27 for goods and services provided in relation to the Debtors' 2014 and 2015 farm inputs. *See* Claim #8-1.  Central to the objections of both First Financial and Bunker Hill Supply were assertions that the plan was infeasible and that the Debtors' assets were undervalued.

The objections to the Original Plan were ultimately resolved and, at a hearing on April 27, 2017, the Debtors were directed to file an amended plan in order to address the creditors' concerns.  In the meantime, on March 31, 2017, the Debtors filed a motion seeking to use First Financial's cash collateral.  In that motion, Debtors alleged that because they had been unable to secure financing for their 2017 crop, it was necessary for them to use the 2015 and 2016 crop proceeds as well as the 2016 government payments in order to operate. All of these funds constitute First Financial's cash collateral.  In exchange, the Debtors offered to grant First Financial a replacement lien in their 2017 crop, crop insurance proceeds, and government payments.  First Financial objected, arguing that because the Debtors had consistently lost

---

[1] It appears from the Court's review that the Debtors' Schedule A/B was amended in order to remove a 1976 Chevy ¾ ton spray truck ($250.00); a Ford spray truck ($750.00) and a utility trailer ($2,000.00).  This resulted in a reduction in the value of the Debtors' vehicle from $49,125.00 to $46,125.00.

money on their farming operation since 2007, the proposed replacement lien on non-existent

crops was insufficient to protect its interest.

The Court conducted an evidentiary hearing on the Motion to Use Cash Collateral on

May 4, 2017.  After hearing the parties' testimony and considering the evidence presented, the

Court granted the motion subject to certain conditions *See In re Blake*, No. 16-60425, 2017 WL

1906603 (Bankr. S.D. Ill. May 8, 2017).  In exchange for the use of its cash collateral, First

Financial was granted, *inter alia*, a first and paramount replacement lien on the Debtors' 2017

crop and related collateral. In addition, to the extent that the 2017 crops and collateral were

insufficient to repay principal cash collateral plus 5.25% interest, First Financial was also

awarded an administrative expense priority claim in accordance with 11 U.S.C. § 507(b) for any

deficiency.  *Id.* at *3.

On June 9, 2017, the Debtors filed a First Amended Chapter 12 Plan ("Amended Plan").

Notably, the Amended Plan adjusts the Debtors' cash flow projections in order to account for a

change in crop type and for a reduction in the number of acres farmed.[2]   The Amended Plan

also addresses the Debtors' use of First Financial's cash collateral pursuant to the May 8, 2107

Opinion, the treatment of certain governmental payments, and the surrender of certain equipment

on which First Financial holds a first lien.

While several other creditors initially objected to the Amended Plan, those objections

have since been resolved.[3]  The only remaining objectors, for purposes of this Opinion, are First

---

[2] Due to the late planting seasons, the Debtors decided to plant exclusively soybeans in 2017.  In addition, the Debtors lost the opportunity to farm approximately 110 acres of leased land because the respective landlords rented the ground to other farmers.

[3] Creditors Farm Credit Services of America, PCA and the U.S. Department of Agriculture/Farm Service Agency also objected to the First Amended Plan.  Those objections, however, have since been resolved by the entry of agreed orders.

Financial and Bunker Hill Supply. With regard to those creditors, the Amended Plan provides, in

pertinent part:

> CLASS G-1: The Class G creditor shall consist of creditor First Financial Bank NA, or its assignee, which is the holder of a blanket lien on farm equipment. The value of the farm equipment being retained is $104,085.00. This secured claim of $104,085.00 will be paid in annual installments, beginning February 15, 2018, in the amount of $24,207.39 which amortizes the claim over five (5) years at 5.25% interest. This claim is impaired and will be paid by the Trustee to the Class G creditor . . . .

> CLASS G-2: The Class G creditor shall consist of creditor First Financial Bank, NA, or its assignee, which is the holder of a first lien on pre-petition crops and crop proceeds. The crop is yet to be fully liquidated as the estimate of the crop proceeds is, based on current prices and estimated bushels, is [sic] $220,000.00. The 2015 crop proceeds remaining is [sic] $50,935.99. The Debtors will use the proceeds for 2017 operating expenses with the interest paid by December 31, 2017 at 5.25%. The process will continue annually for the three year term of this plan with the principal being paid in full from the 2019 harvest. This claim is impaired.

> CLASS G-3: The Class G-3 creditor shall consist of creditor First Financial Bank NA, or its assignee, which is the holder of a blanket lien on farm equipment. The value of the farm equipment being retained, in which other creditors have a first lien purchase money security interest (PMSI) is $4455.03. This secured claim of $4455.03 will be paid in annual installments, beginning February 15, 2018, in the amount of $1038.61 which amortizes the claim over five (5) years at 5.25% interest. This claim is impaired and will be paid by the Trustee to the Class G creditor. . . . .[4]

> \* \* \*

> CLASS I: This class shall consist of all Debtors' under-secured and unsecured (including post-petition taxes realized from the sale of the debtors farm assets) creditors whose claims are filed and allowed by the Court. All unsecured and under-secured creditors whose claims are filed and allowed shall be paid their pro-rata share of their disposable income as defined by Code § 1225(b)(2) or the hypothetical liquidation value annually for three years, whichever is higher, with the first payment being due on or before March 31, 2018. The payments to the unsecured creditors shall be subject to the Chapter 12 Trustee's statutory fee and shall be paid to the trustee.

---

[4] This provision was not included in the Original Plan.

* * *

## LIQUIDATION ANALYSIS

All of the Debtors' assets except for their residence are subject to mortgages or
security interests of secured creditors.  Personal property not subject to the lien is
exempt.  The liquidation analysis is required pursuant to § 1225(a)(4) which
provides the creditors be paid not less than an amount they would receive under a
chapter 7 liquidation. . . . .The residence is valued at $52,500 with a liquidation
value of $42,000.  Applying the homestead exemption of $30,000 leads to a
liquidation value of $12,000.  It is likely the debtors' [sic] will have significant
tax liability from 2016 (due to lack of fall expenses) which exceeds the
liquidation value so unsecured creditors would not receive a distribution.

Debtors' Am. Ch. 12 Plan 11-12; 14-15.

In their objections, both Bunker Hill Supply and First Financial maintain that the

Amended Plan fails to comply with 11 U.S.C. § 1225 and, therefore, cannot be confirmed.

Specifically, they assert that the Debtors have substantially undervalued their assets and

overvalued their income in an attempt to pay nothing to their general unsecured creditors.

Further, both creditors argue that the Amended Plan is not feasible because the Debtors' income

and expense projections are unsupported by Debtors' past income and expense figures. Finally,

both Bunker Hill Supply and First Financial posit that the liquidation analysis set forth in the

Amended Plan is not only inaccurate, but also violates 11 U.S.C. § 1225(a)(4) as it does not

provide unsecured creditors what they would otherwise receive in a Chapter 7 case.

In addition to these mutual objections, First Financial also raises several other objections

specific to its collateral and treatment under the Amended Plan.  It asserts that the Amended Plan

(1) fails to identify or account for nine (9) pieces of equipment that Karl Blake previously

testified to owning; (2) impermissibly includes a "rolling cash collateral crop lien" provision in

violation of 11 U.S.C. § 1225(a)(5)(B); and (3) inaccurately implies that the Debtors will "owe

5

net taxes for 2017 due to their significant loss carry forwards." First Financial Bank's Obj. to Am. Ch. 12 Plan (Doc. #112) at 2.[5]

Besides the above-referenced objections, the Amended Plan has also generated a request by First Financial that the Court reconsider its May 8, 2017 Order granting Debtors' Motion to Use Cash Collateral and a Motion for Relief from Stay. The Court conducted hearings on all of the outstanding motions and objections on October 16 and October 24, 2017. After hearing the testimony of witnesses and reviewing the evidence submitted, the Court took the matter under advisement.

## ANALYSIS

### I. OBJECTIONS TO CONFIRMATION

The requirements for Chapter 12 plan confirmation are set forth in 11 U.S.C. § 1225. Those requirements include: (1) that objecting secured creditors retain their liens and receive the present value of their claims (11 U.S.C. § 1225(a)(5)(B)); (2) that unsecured creditors receive what they would have otherwise received if the estate had been liquidated in a Chapter 7 case (11 U.S.C. § 1225(a)(4)); and (3) that the debtor be capable of making all payments under the plan (11 U.S.C. § 1225(a)(6)).[6] The debtor bears the burden of proving by a preponderance of the evidence that the proposed plan satisfies all of the statutory requirements of § 1225. *In re Snider Farms, Inc.*, 83 B.R. 977, 985 (Bankr. N.D. Ind. 1988); *See also In re Krause*, 261 B.R. 218, 222 (8th Cir. B.A.P. 2001); *In re Terry Properties, LLC*, 569 B.R. 76, 86 (Bankr. W.D. Va. 2017); *In re Tortelli*, 338 B.R. 390, 395 (Bankr. E.D. Ark. 2006); *In re Weber*, 297 B.R. 567, 571 (Bankr.

---

[5] First Financial raised several other objections, including the failure of the Amended Plan to address First Financial's interest in the Debtors' livestock and shop equipment and to clearly identify the collateral that the Debtors seek to retain and that which they wish to surrender. The Debtors either conceded these objections in their response or at subsequent hearings (*See* Doc. #178).

[6] There are several other confirmation requirements prescribed by § 1225 that are not at issue in this case.

N.D. Iowa 2003). In addition, the Court has an independent obligation to ensure that the plan

complies with § 1225. *In re Snider Farms, Inc.* at 986.

## A. TREATMENT OF SECURED CLAIMS AND 11 U.S.C. § 1225(a)(5)

Pursuant to 11 U.S.C. § 1225(a)(5), the Court shall confirm a plan if—

(5)  with respect to each allowed secured claim provided for by the plan—

> (A)  the holder of such claim has accepted the plan;

> (B) (i) the plan provides that the holder of such claim retain the lien securing such claim; and

>> (ii)  the value as of the effective date of the plan, to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim; or

> (C)  the debtor surrenders the property securing such claim to such holder. . . .

11 U.S.C. § 1225(a)(5). "In short, this statute provides that if a secured claim holder does not

accept the plan under § 1225(a)(5)(A), the debtor must either provide for the creditor's retention

of its lien and pay the present value of the claim pursuant to section 1225(a)(5)(B) or surrender

the property in accordance with section 1225(a)(5)(C)." *In re Tortelli*, 338 B.R. at 395.

In the instant case, secured creditor First Financial does not accept the Amended Plan,

nor does the Amended Plan provide for the surrender of all of First Financial's collateral.

Accordingly, in order to overcome First Financial's objection, the Amended Plan must provide

not only for retention of First Financial's lien, but also for payment of the value of First

Financial's claim as of the effective date of the plan. There is no dispute that First Financial will

retain its lien(s) under the Amended Plan. Instead, the parties' disagreement is centered on the

appropriate value to be assigned First Financial's collateral.

7

Both the Debtors and First Financial produced testimony as to their posited values. Debtor Karl Blake testified on October 16, 2017 and again on October 24, 2017 in support of the values stated in the Amended Plan. In testifying, Mr. Blake relied on a chart that had been appended to the Amended Plan which lists fifty-three (53) pieces of encumbered equipment, machinery and other personal property in which Debtors believe First Financial has a security interest. (Debtors' Ex. D). Mr. Blake testified in great and specific detail as to each piece of property. Virtually every item was characterized by Mr. Blake as being either old or subject to some type of mechanical defect. Because of its poor condition, Mr. Blake testified that the collateral had a total value of no more than $101,110.00. This value, however, was not determined by an appraiser. Instead, Mr. Blake testified that he had valued each piece of property based on his years of farming experience, discussions with other farmers, and his general knowledge of equipment prices.

Conversely, First Financial offered the testimony of appraiser Hank Bauer of Bauer Auction Service in support of its alleged values. Mr. Bauer testified that he has been an auctioneer and appraiser for more than twenty years and that he has extensive experience in the valuation and sale of farm equipment. In addition to his employment as an auctioneer and appraiser, Mr. Bauer also farmed with his father for nearly twenty-one years.

According to the evidence presented, Mr. Bauer conducted an appraisal of First Financial's collateral at the request of loan officer Bart Duesdieker. The subject property was inspected on September 15, 2016, which was approximately six weeks before the Debtors filed their Chapter 12 petition. Mr. Bauer was accompanied during the inspection by his father (who is also an experienced auctioneer), Mr. Duesdieker, and Mr. Blake. Mr. Bauer testified that he discussed the condition of each piece of equipment with Mr. Blake and inquired as to any

8

specific issues or problems that might affect the equipment's value.  According to Mr. Bauer,

Mr. Blake participated freely in these discussions, and, in fact, Mr. Bauer took Mr. Blake's

comments into consideration when assigning his appraised values, especially as to those items of

collateral that were not available for inspection.[7]

       In his appraisal report, Mr. Bauer valued First Financial's collateral at $480,400.00.  The

Debtors have since decided to surrender some of the subject collateral.  Accordingly based on

Mr. Bauer's appraisal, the value of the collateral that the Debtors seek to retain is $196,745.00.

First Financial Bank's Closing Argument (Doc. #190) at 8.

       As between the two witnesses, the Court finds the testimony of Mr. Bauer to be more

credible.  The Debtors' values are substantially and categorically lower than those provided by

the appraiser and, for that matter, from the values that the Debtors themselves provided in certain

financial statements given to Bunker Hill Supply. (Bunker Hill Supply Ex. 1, 2 and 3).  While it

is was clear that Mr. Blake is exceptionally knowledgeable as to the condition of his equipment,

the veracity of his testimony came into question when, on cross-examination, his responses were

evasive and less than candid.

       Further, this Court has no reason to believe that Mr. Bauer failed to consider the

property's condition in completing his appraisal.  Mr. Bauer testified that he was told by the

lender to value the equipment "as it lay" or, in other words, in its "as is" condition.  Mr. Bauer's

opinion as to the condition of the collateral (poor, good, etc.) is reflected in his appraisal report.

The report states: "The personal property priced will dramatically fluctuate, based on [the]

condition of the personal property, no matter how well maintained that piece may be.  The

---

[7] The testimony indicated that there several items that were not available for inspection because they were either
being repaired or at a remote location.

property [appraised] is in poor to excellent condition, which reflects the values placed on them unless otherwise stated." (First Financial Bank's Ex. 1 at 6).

Based on this, the Court finds that the values assigned by appraiser Hank Bauer should be used in valuing First Financial's collateral with one exception. Among the equipment at issue was a Kinze 1631 center-pivot planter which the Debtors valued at $12,500.00.  Mr. Blake testified that the planter's center-pivot housing is cracked, which is apparently a common problem with this particular model. In addition,  Mr. Blake testified that the planter's frame also broke alongside the road and had to be hastily welded back together.  According to Mr. Blake, the weld was not a "proper" repair.  While Mr. Bauer's appraised value of $31,500.00 took into account the center-pivot crack, no adjustment/reduction was made for the broken frame. Accordingly, after evaluating the testimony, the Court finds that the value of Kinze planter is $25.000.00.

For purposes of clarity, the Court has appended a chart (Chart I), which lists the machinery and equipment that is subject to First Financial's security interest as well as the corresponding value of each item.  In addition to the fifty-three items listed in the Amended Plan, this chart also includes livestock and shop equipment that the Debtors acknowledge that they failed to address in the Amended Plan.[8] Debtors' Response to Plan Objections (Doc. #178) at 4. It also includes eight (8) pieces of equipment that Mr. Blake testified to owning at his 2004 examination, but which were neither scheduled on the Amended Schedule A/B nor addressed in the Amended Plan.[9]

---

[8] Debtors concede in their response to First Financial's objection that they failed to include $16,542.50 in livestock and $1,500.00 in shop equipment that is subject to First Financial's lien.

[9] At the hearings, First Financial alleged that Mr. Blake had previously testified to owning a ninth piece of equipment--a Kilbros 350 gravity cart with an appraised value of $550.00.  However, Mr. Blake consistently testified at both valuation hearings that he has never owned such an item.

The Court notes that in their closing, the Debtors argue that the Court should reject Mr. Bauer's appraisal on the grounds that it fails to value the collateral "as of the effective date of the plan" as required by § 1225(a)(5)(B).  While the Bankruptcy Code does not specifically define this term, case law suggests that the proper date for determining the value of a secured creditor's collateral is the date of the valuation hearing.  *In re Anderson*, 88 B.R. 877, 884-885 (Bankr. N.D. Ind. 1988).  Here, Mr. Bauer conducted his appraisal on September 15, 2016, approximately six weeks before the debtors filed their Chapter 12 petition on November 2, 2016 and, admittedly, over one year before the October 2017 valuation hearings. However, there was no testimony to suggest that the property had significantly declined in value since Mr. Bauer's inspection or the filing of the case.  In fact, *the Debtors themselves* made no adjustments for depreciation, as the values testified to by Mr. Blake at the October 2017 hearings are *identical* to the values the Debtors assigned to the collateral on their original Schedule A/B filed November 2, 2016 and on their amended Schedule A/B filed December 2, 2016.  Because the Debtors have noted no change in the value of the property since November 2016, the Court finds no reason to discount Mr. Bauer's appraisal, which was performed only six weeks earlier.

Based on the foregoing, the Court determines that Amended Plan fails to pay First Financial the value of its claim as of the effective date of the plan and, therefore, does not comply with the confirmation requirements of 11 U.S.C. § 1225(a)(5).

## B.  TREATMENT OF UNSECURED CLAIMS AND 11 U.S.C. § 1225(a)(4)

Like its safeguards for secured creditors, Chapter 12 also affords certain protections for unsecured creditors.  In order to be confirmed, a Chapter 12 plan must comport with 11 U.S.C. § 1225(a)(4).  This section, also commonly referred to as the "best interests of creditors" test "denies confirmation to any plan which provides unsecured creditors with less compensation

than they would receive upon liquidation of the farm." *Matter of Fortney*, 36 F.3d 701, 704 (7th

Cir. 1994). In order to determine whether a proposed plan satisfies this requirement, the Court

must

> perform[] a hypothetical liquidation analysis taking into account the value of the
> property available to creditors as of the effective date of the plan and then
> compar[e] that value to what each creditor will be receiving under the plan as
> proposed. The plan may be confirmed only if the present value of the proposed
> payments at least equal the likely distribution from the hypothetical liquidation.

*In re Novak*, 252 B.R. 487, 491 (Bankr. D. N.D. 2000). *See also* 8 COLLIER ON BANKRUPTCY ¶

1225.02[4] at 1225-8 (Richard Levin & Henry J. Sommer, eds., 16th ed).

As previously indicated, the liquidation analysis included with the Amended Plan

anticipates no payment to unsecured creditors. Debtors maintain that virtually all of their assets

are encumbered and that any personal property not subject to liens is exempt. While Debtors do

provide a liquidation figure of $12,000.00 based on the non-exempt equity in their residence,

they indicate that their anticipated 2016 tax liability will likely exceed this amount, and,

therefore, there will be no distribution to unsecured creditors.

Both First Financial and Bunker Hill Supply dispute the Debtors' liquidation analysis.

They maintain that there are, in fact, several unencumbered assets listed on the Debtors'

schedules that would be available for the benefit of unsecured creditors. The primary asset is a

2016 Timpte trailer with an appraised value of $30,000.00. Mr. Blake admitted at the hearing on

October 16, 2017 that this property was unencumbered.[10] In addition, the Debtors' schedules

show they own several other vehicles and trailers that are not subject to liens. This additional

---

[10] According to the testimony, the Debtors own three (3) Timpte trailers—two that are operational and one that was damaged in an accident and is kept for parts. First Financial holds the lien on the 2010 model. The 2016 model was purchased with insurance proceeds to replace the damaged trailer. It is unencumbered. Debtors' counsel explained at the hearing on October 16, 2017 that there was confusion when the petition was filed as to which trailer was subject to First Financial's security interest.

property includes: (a) a 1995 International-Harvester B200 Truck with an appraised value of

$7,500.00; (b) a 1989 Corn Pro gooseneck trailer with an appraised value of $4,250.00; (c) a

Ford grain truck, valued by the Debtors at $375.00[11]; (d) an IT Chevrolet Dually truck valued at

$75.00; (e) a 1986 Chevrolet Dually truck valued at $100.00; (f) a Loadstar 1600 fertilizer truck

valued at $300.00; (g) a 1985 Trail King 3-axle trailer valued at $400.00; and (h) a Utility semi-

trailer valued at $2,000.00.[12]  Based on these values, the Debtors have at least $45,000.00 gross

available equity in these vehicles alone.

In addition, it appears that the Debtors also misidentified and undervalued a 2013 Chevy

pickup truck in their schedules.  According to Amended Schedule A/B and Schedule C, the

Debtors own a 2013 Chevy Silverado pickup truck with an NADA value of $14,775.00.  The

schedules indicate that at the time of filing, the balance owed to lien holder Citizens One Auto

Finance was $24,283.04, with a resulting deficiency of $9,508.04.  However, Debtors' counsel

acknowledged at the hearing on October 24, 2017 that the value listed in the schedules is for a

Silverado 1500 and that the model that the Debtors own is actually a Silverado 3500.  Mr. Blake

also testified under cross-examination by his counsel that his truck has a crew cab, a diesel

engine, four-wheel drive, and dual rear tires.  Although no appraisal was offered as to the

vehicle's value, counsel for Bunker Hill Supply did produce a copy of the Kelly Blue Book

Report stating that a 2013 Silverado 3500 with the above-referenced features has a fair market

value of anywhere between $34,140.00 and $40,927.00. (Bunker Hill Supply Ex. 6).  Without

further evidence, the Court is unable to determine an exact liquidation value for this truck.

[11] Debtors' values are those stated on their Amended Schedule A/B filed December 2, 2017.  The Debtors values
were used when there was no appraised value.
[12] At hearing and in its written closing argument, First Financial also argued that the Debtors owned a 1976
Chevrolet ¾ -ton spray truck and a Ford spray truck.  However, while these two vehicles were listed on the Debtors'
original Schedule A/B, they were not listed on the amended Schedule A/B.

However, it would appear based on what evidence was presented, that there may be equity in the vehicle for the benefit of unsecured creditors of at least $10,000.00.

Similarly, Bunker Hill Supply also contends that there is substantial equity in the Debtors' real estate that was not considered in the Debtors' liquidation analysis.  This argument is based on a comparison of the real estate values that the Debtors' provided in financial statements from 2014 and 2015 (Bunker Hill Supply Ex.1, 2), and those listed in their 2016 bankruptcy schedules.  Because the figures in the financial statements are drastically higher than those set forth in the Debtors' schedules, Bunker Hill Supply urges this Court to infer that the Debtors undervalued their real property in this bankruptcy to avoid paying their unsecured creditors.  Value cannot be "inferred."  It must be based on actual evidence—which is something that none of the parties produced on this issue.  There was no testimony from an appraiser as to the real property's value nor was a cogent explanation offered from Mr. Blake as to how he arrived at his real estate values. Essentially the Court is being asked to determine the real estate's value by choosing between several unsubstantiated figures posited by the Debtors.  This is something the Court cannot-- and will not-- do.

Due to the lack of a verifiable valuation as to the real estate and incomplete evidence as to the value of Debtors' 2013 Silverado 3500, the Court is unable to formulate an exact liquidation figure.  However, it is clear that the Debtors' unencumbered vehicles and trailers alone have a value that is greater than the $12,000.00 liquidation figure set forth in the Amended Plan.  Further, even if the Court factors in the Debtors' 2016 tax liability, which is expected to exceed $24,000.00, unsecured creditors would still receive more in a hypothetical liquidation than the $0 distribution proposed in the Amended Plan.  Accordingly, the Amended Plan fails to satisfy 11 U.S.C. § 1225(a)(4) and cannot be confirmed.

14

### C. FEASIBILITY AND 11 U.S.C. § 1225(a)(6)

The final objection raised by both First Financial and Bunker Hill is that the Amended Plan fails to meet the feasibility requirements of 11 U.S.C. § 1225(a)(6).   This section dictates that a plan may be confirmed only if "the debtor will be able to make all of the payments under the plan and comply with the plan."  11 U.S.C. § 1225(a)(6).  This test requires the Court to "carefully scrutinize the proposed payments in light of projected income and expenses and consider whether they are based upon realistic and objective facts and whether they are capable of being met."  *In re Szudera*, 269 B.R. 837, 842 (Bankr. D. N.D. 2001) (*citing In re Alvstad*, 223 B.R. 733, 745 (Bankr. D. N.D. 1998)).

In order to demonstrate the feasibility of their Amended Plan, the Debtors included a spreadsheet detailing their 2017 operating projections.  According to the spreadsheet, the Debtors anticipated total income of $280,651.67 less operational expenses of $156,808.99 and personal expenses of $28,437.86 for a total profit of $95,404.72.

Both debtor Karl Blake and his son Jeremy Blake testified in support of these projections at the hearing on October 24, 2017.  Their testimony and other evidence focused primarily on the income generated from the Debtors' farm operation ("operating income"). Of the $280,651.67 projected total income, $241,195.32 is comprised of income that the Debtors expected to realize from the sale of their 2017 crop.   This figure was predicated on the Debtors'437.9 acres of soybeans yielding 54 bushels per acre and being sold at an estimated price of $10.20 per bushel. Because of the fluctuating nature of bean prices, the Debtors also offered evidence showing that their Plan would still be feasible at various other price points ranging from $9.69 per bushel to $10.00 per bushel. (Debtors' Ex. G).

In addition to the operating income, the Debtors' projections rely on several other sources of income. These include estimated annual wages of $7,200.00 for co-debtor Jenna Blake; "miscellaneous" annual income of $15,500.00 for debtor Karl Blake; annual cattle sales of $7,978.25; and 2016 governmental commodity support payments of $8,778.00 ("ARC payments").

Unfortunately for the Debtors, their projected non-operating income appears to be either overstated or unavailable. The Debtors' Chapter 12 Monthly Reports show that through September 2017, the Debtors' combined off-farm income was only $6,647.22. Further, no cattle have been sold since the bankruptcy was filed. (First Financial Bank Ex. 5). Although Mr. Blake testified at the October 24, 2017 hearing that he received 2016 ARC payments totaling $11,613.00, this Court has previously held that these payments constitute First Financial's cash collateral and, therefore, may not be used by the Debtors absent First Financial's consent.

As to the Debtors' projected operating income, the evidence indicates that the Debtors' figures are not supported by either the Debtors' historic yields or by current soybean prices. Mr. Duesdieker of First Financial testified that documentation produced at the Debtors' 2004 examination revealed a 2016 bean yield of approximately 42 bushels per acre. While Jeremy Blake testified that he believed that the 2016 yield was slightly higher at approximately 45 bushels per acre, both figures are substantially lower than the Debtors' 54 bushels per acre 2017 projection. Even assuming that 2016 was a particularly poor crop year, there was no evidence to suggest that the Debtors have ever achieved yields of 54 bushels per acre. As the Court explained in *In re Weber*, 297 B.R. 567 (Bankr. N.D. Iowa 2003):

> The debtors' income and expense projections are considered in conjunction with their actual past performance to determine feasibility. *In re Euerle Farms, Inc.,* 861 F.3d 1089, 1090 (8th Cir. 1988). 'Because past behavior and productivity are

16

excellent indicators of future production, courts have frequently rejected plans which are premised on highly optimistic projections of increased production.' *In re Crowley*, 85 B.R. 76, 79 (W.D. Wis. 1988).

*Weber* at 571.

Similarly, the Court can find no evidence to support an estimated soybean price of $10.20 per bushel.  While there was testimony from Jeremy Blake that Chicago Board of Trade prices had reached $10.35 per bushel at one point during this bankruptcy, prices as of the October 24, 2017 hearing were not nearly this high.  According to the testimony, Archer Daniels Midland ("ADM") was offering $9.84 per bushel for December 1, 2017 delivery and Mont Eagle Mills-- where the bulk of Debtors' soybean crop was stored-- approximately $9.55 per bushel. (Debtors' Ex. W).  Neither of these prices is remotely near the Debtors' $10.20 projection.[13]

However, even if the Court were to accept the Debtors' income figures in their entirety, the Amended Plan would still be infeasible because the Debtors' income is insufficient to meet their expenses.  According to the Debtors' calculations, they will have income of $95,404.72 remaining after payment of expenses with which to service $83,266.39 in debt. This results in net income after plan payments of $12,138.33 (Debtors' Closing Argument 7 (Doc. #189)). However, the Debtors' analysis is predicated on a debt service payment of $24,207.39 to First Financial on its Class G-1 claim (farm equipment) and of $5,733.00 on its Class G-2 claim (operating loan interest).   These figures are both *substantially* lower than the requisite repayment amounts, as they are based on Debtors' understated collateral values.  The Court has prepared a chart (Chart II) illustrating the disparity between the Debtors' projected debt service payments and their actual payments.  While these figures may not be exact, they are certainly a

---

[13] The Court takes judicial notice of the Debtors' response to First Financial's Motion to Compel Compliance with Order Authorizing Use of Cash Collateral which was filed January 30, 2018 (Doc. #195).  In that document, the Debtors state that the actual yield realized for the 2017 crop was 51.83 bushels/acre and that beans were sold to Mont Eagle at prices ranging from $9.22/bushel to $9.56/bushel.

closer approximation of what is owed on First Financial's claims than those advanced by the Debtors.

Further, in addition to understating the Debtors' debt service payments, the Amended Plan also fails to address over $24,000.00 in unpaid 2016 tax liability or to provide any dividend to unsecured creditors. When all of these expenses are factored against the Debtors' income, it is clear that the Debtors are incapable of funding the Amended Plan as proposed. "Courts generally grant debtors every reasonable benefit of the doubt in matters concerning plan feasibility in furtherance of the rehabilitative policies underlying the Code. They will not, however, blindly confirm a plan which will not cash flow, and which is, therefore, unfeasible." *In re Weber*, 297 B.R. at 571. Accordingly, creditors' feasibility objections pursuant to 11 U.S.C. § 1225(a)(6) are sustained.

As the Debtors have failed to satisfy their burden of proof as to §§1225(a)(4), (5) and (6) of the Bankruptcy Code, the Amended Plan cannot be confirmed. The Debtors, however, are granted leave to file a Second Amended Plan in order to address the issues raised herein.

## II. FIRST FINANCIAL'S MOTION TO RECONSIDER OF MODIFY CASH COLLATERAL ORDER

In addition to opposing confirmation of the Debtors' Amended Plan, First Financial also requests that this Court reconsider or modify its May 8, 2017 Order granting Debtors the use of its cash collateral. It asserts that the Debtors' financial condition has deteriorated to such an extent that the liens and other interests that the Court granted First Financial no longer adequately protect its cash collateral.

In its May 8, 2017 Opinion, the Court found that "even taking the Bank's worst case scenario, the Debtors still show[ed] sufficient income for the 2017 crop year to repay expended cash collateral plus interest." *Blake,* 2017 WL 1906603 at *2. However, First Financial argues

18

that the Court's decision to grant the use of cash collateral was based on the Debtors' *original* plan and cash flow projections.  Both the Amended Plan projections and the testimony at the October 2017 hearings show that the Debtors have experienced a reduction in income due to a loss of leased acreage and a non-diversified crop.  In addition, the Debtors now have other expenses, such as unpaid 2016 tax liability, which were not considered in the Court's prior Opinion.  Therefore, First Financial asks that the Court either terminate the Debtors' use of its cash collateral or, alternatively, limit its use to any remaining harvesting needs.

Based on the evidence presented at the October 24, 2017 hearing, it is clear that the Debtors' actual income is well short of their May 2017 projections and that their plan payments will need to be *substantially* increased in order to comply with the requirements of 11 U.S.C. § 1225.  However, despite these changes in the Debtors' economic situation, it is not necessary, at this point, to vacate the May 8, 2017 cash collateral Order.  Pursuant to the terms of that Order, the Debtors were *only* authorized to use First Financial's *2017* cash collateral.  As the 2017 crop has now been both planted and harvested, the use of cash collateral should be limited to the Debtors' remaining 2017 harvest expenses, such as the transportation of the harvested 2017 crop. Any further use of First Financial's cash collateral beyond these parameters is prohibited.

### III.  FIRST FINANCIAL'S MOTION FOR RELIEF FROM STAY

Finally, First Financial request that it be granted relief from the automatic stay in order to recover its collateral (Doc. #114).  It maintains that its interests are not adequately protected and, therefore, it is entitled to relief from stay pursuant to 11 U.S.C. § 362(d)(1).  The Court reserves ruling on this motion pending the filing of the Debtors' Second Amended Plan.

## CONCLUSION

Because the Amended Plan fails to satisfy all of the requirements of 11 U.S.C. § 1225, it cannot be confirmed.  However, the Debtors are granted leave to file a Second Amended Plan to address the valuation, feasibility and adequate protection issues raised both in the Objections to Confirmation and the Motion for Relief from Stay.

ENTERED: March 6, 2018

/s/ Laura K. Grandy
_____
UNITED STATES BANKRUPTCY JUDGE

CHART I

| | ITEM | VALUE |
|---|---|---|
| 1 | JD Hay Tedder | $300.00 |
| 2 | 806 International Tractor | $3,500.00 |
| 3 | Scaffold | $120.00 |
| 4 | Anhydrous Tool BR | $200.00 |
| 5 | Disk Chisel | $1,500.00 |
| 6 | 8" Blade and Hydraulic Cylinder | $1,500.00 |
| 7 | 2010 Timpte Trailer | $22,000.00 |
| 8 | 100 Gallon Fuel Tank with Pump | $100.00 |
| 9 | Tractor Weights | $500.00 |
| 10 | M & W 300 Bushel Gravity Wagon | $200.00 |
| 11 | 2670 Case 4WD Tractor | $5,500.00 |
| 12 | Sidewinder Rotary Ditcher | $750.00 |
| 13 | Bush Hog Rotary Mower | $900.00 |
| 14 | 475 Bushel Kilbros Auger Cart | $2,850.00 |
| 15 | JD Wagon Running Gears | $200.00 |
| 16 | M & W Grain Pup Trailer | $500.00 |
| 17 | 500 Gallon Stainless Steel Tank | $250.00 |
| 18 | JD 7000 Planter 12-Row | $175.00 |
| 19 | Westfield Auger 8" x 30' | $2,250.00 |
| 20 | Two (2) Feteral Swing Away Augers | $3,500.00 |
| 21 | 420 JD Belly Mower | $75.00 |
| 22 | Kinze Planter | $25,000.00 |
| 23 | 89 IMF Spray Truck | $4,000.00 |
| 24 | Stainless Steel Tank | $700.00 |
| 25 | Seed Tender | $2,750.00 |
| 26 | Fork Lift Mask | $150.00 |
| 27 | 2 x 350 Gallon Stainless Tanks | $500.00 |
| 28 | Outback Guidance System | $250.00 |
| 29 | S-3 Guidance System | $250.00 |
| 30 | Westfield Auger 10" x 31' | $450.00 |
| 31 | 8" Westfield Auger | $325.00 |
| 32 | Hydraulic Seed Tender Auger Mate | $175.00 |
| 33 | Grain Vac "Brandt" | $9,000.00 |
| 34 | 9180 Case Tractor 4WD | $18,500.00 |
| 35 | Westfield 10 x 71 Auger | $2,750.00 |
| 36 | Head Trailer | $700.00 |
| 37 | IH 2208 Corn Head | $7,000.00 |
| 38 | JM 874 Cart Head | $1,600.00 |
| 39 | Fertilizer Conveyer | $200.00 |
| 40 | JD 8760 4WD Tractor | $22,500.00 |
| 41 | 1000 Gallon LP Tank (Used) | $900.00 |
| 42 | 1000 Gallon LP Tank (Newer) | $1,400.00 |
| 43 | E Drive GSI Monitor | $500.00 |
| 44 | E Drive GSI Monitor | $500.00 |
| 45 | Corn Pro 2 Axle Trailer | $500.00 |
| 46 | Bailer Fork Assembly | $75.00 |
| 47 | Single Tire Bale Spear | $50.00 |
| 48 | JD Pallet Forks | $200.00 |

CHART I

| 49 | GSI Grain Bin 24' | $2,000.00 |
| 50 | 760 Loader Oil 1370 | $450.00 |
| 51 | Outback Guidance System | $100.00 |
| 52 | GSI Grain Bin Dryer | $39,500.00 |
| 53 | 2013 Westfield Auger (in parts) | $400.00 |
| 54 | Batco 1540 40' Hydraulic Auger | $9,500.00 |
| 55 | JD F1450 Bottom Plow | $900.00 |
| 56 | P & H  AA Bar 13 knife Yetter no till | $2,000.00 |
| 57 | EZ Flow 250 bushel gravity wagon w/ JD Gears | $600.00 |
| 58 | IH 1466 Fender Tractor | $7,000.00 |
| 59 | Westfield 10 x 40 Auger | $4,250.00 |
| 60 | J & M 350 Gravity Wagon | $550.00 |
| 61 | Westfield 8 x 36 Auger 10 hp Motor | $900.00 |
| 62 | Livestock | $16,542.50 |
| 63 | Shop Equipment | $1,500.00 |

## CHART II

| Creditor | Proposed Plan Repayment | Actual Debt Service Payment |
|---|---|---|
| Ag Direct (Class B-1) | $3,488.60 | $3,488.60 (per 11-2-17 order) |
| Ag Direct (Class B2) | $642.77 | $744.23 (per 11-2-17 order) |
| Citizens One Auto (Class C) | $5,553.00 | $5,553.00 |
| Farm Service Agency (Class E-1) | $11,932.25 | $11,932.25 |
| Farm Service Agency (Class E-2) | $5,972.28 | $5,972.28 |
| First Financial Bank (Class G-1) | $24,207.39 | $49,199.16[1] |
| First Financial Bank (Class G-2) | $5,733.00 | $14,224.14 |
| First Financial Bank (Class G-3) | $1,038.61 | $1,038.61 |
| John Deere (Class H-2) | $3,609.31 | $3,649.87 (per 10-16-17 order) |
| John Deere (Class H-4) | $13,799.01 | $13,954.10 (per 10-16-17 order) |
| First Financial- Misc. Tools | $341.75 | $341.75 |
| First Financial-Livestock | $3,768.91 | $3,768.91 |
| TOTAL PAYMENTS | $80,086.88 | **$113,866.90[2]** |

---

[1] In its closing brief, First Financial offered a figure of $50,805.36 as to its Class G-1 Claim. However, that figure was based on the Court accepting all of First Financial's appraised values and finding that First Financial had an interest in all of the collateral that had been omitted from the Debtors' schedules. The Court did not accept First Financial's value as to the Kinze Planter, nor did it include the Kilbros 350 gravity wagon as part of the "omitted collateral." The Court notes however, that its calculation is based on a monthly amortization and, accordingly the actual annual debt service payment could be higher than $49,199.16.

[2] This total does not include a trustee fee, which would still need to be included. The Court did not calculate the Trustee fee since the Debtors are so under water.